(Slip Opinion)	OCTOBER TERM, 2009	1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## PADILLA *v.* KENTUCKY

### CERTIORARI TO THE SUPREME COURT OF KENTUCKY

No. 08–651.   Argued October 13, 2009—Decided March 31, 2010

Petitioner Padilla, a lawful permanent resident of the United States for over 40 years, faces deportation after pleading guilty to drug-distribution charges in Kentucky.  In postconviction proceedings, he claims that his counsel not only failed to advise him of this consequence before he entered the plea, but also told him not to worry about deportation since he had lived in this country so long.  He alleges that he would have gone to trial had he not received this incorrect advice.  The Kentucky Supreme Court denied Padilla postconviction relief on the ground that the Sixth Amendment's effective-assistance-of-counsel guarantee does not protect defendants from erroneous deportation advice because deportation is merely a "collateral" consequence of a conviction.

*Held:* Because counsel must inform a client whether his plea carries a risk of deportation, Padilla has sufficiently alleged that his counsel was constitutionally deficient.  Whether he is entitled to relief depends on whether he has been prejudiced, a matter not addressed here. Pp. 2–18.

   (a) Changes to immigration law have dramatically raised the stakes of a noncitizen's criminal conviction.  While once there was only a narrow class of deportable offenses and judges wielded broad discretionary authority to prevent deportation, immigration reforms have expanded the class of deportable offenses and limited judges' authority to alleviate deportation's harsh consequences.  Because the drastic measure of deportation or removal is now virtually inevitable for a vast number of noncitizens convicted of crimes, the importance of accurate legal advice for noncitizens accused of crimes has never been more important. Thus, as a matter of federal law, deportation is an integral part of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes.  Pp. 2–6.

(b) *Strickland* v. *Washington*, 466 U. S. 668, applies to Padilla's claim. Before deciding whether to plead guilty, a defendant is entitled to "the effective assistance of competent counsel." *McMann* v. *Richardson*, 397 U. S. 759, 771. The Supreme Court of Kentucky rejected Padilla's ineffectiveness claim on the ground that the advice he sought about deportation concerned only collateral matters. However, this Court has never distinguished between direct and collateral consequences in defining the scope of constitutionally "reasonable professional assistance" required under *Strickland*, 466 U. S., at 689. The question whether that distinction is appropriate need not be considered in this case because of the unique nature of deportation. Although removal proceedings are civil, deportation is intimately related to the criminal process, which makes it uniquely difficult to classify as either a direct or a collateral consequence. Because that distinction is thus ill-suited to evaluating a *Strickland* claim concerning the specific risk of deportation, advice regarding deportation is not categorically removed from the ambit of the Sixth Amendment right to counsel. Pp. 7–9.

(c) To satisfy *Strickland*'s two-prong inquiry, counsel's representation must fall "below an objective standard of reasonableness," 466 U. S., at 688, and there must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.*, at 694. The first, constitutional deficiency, is necessarily linked to the legal community's practice and expectations. *Id.*, at 688. The weight of prevailing professional norms supports the view that counsel must advise her client regarding the deportation risk. And this Court has recognized the importance to the client of " '[p]reserving the . . . right to remain in the United States' " and "preserving the possibility of" discretionary relief from deportation. *INS* v. *St. Cyr*, 533 U. S. 289, 323. Thus, this is not a hard case in which to find deficiency: The consequences of Padilla's plea could easily be determined from reading the removal statute, his deportation was presumptively mandatory, and his counsel's advice was incorrect. There will, however, undoubtedly be numerous situations in which the deportation consequences of a plea are unclear. In those cases, a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry adverse immigration consequences. But when the deportation consequence is truly clear, as it was here, the duty to give correct advice is equally clear. Accepting Padilla's allegations as true, he has sufficiently alleged constitutional deficiency to satisfy *Strickland*'s first prong. Whether he can satisfy the second prong, prejudice, is left for the Kentucky courts to consider in the first instance. Pp. 9–12.

(d) The Solicitor General's proposed rule—that *Strickland* should

Syllabus

be applied to Padilla's claim only to the extent that he has alleged affirmative misadvice—is unpersuasive. And though this Court must be careful about recognizing new grounds for attacking the validity of guilty pleas, the 25 years since *Strickland* was first applied to ineffective-assistance claims at the plea stage have shown that pleas are less frequently the subject of collateral challenges than convictions after a trial. Also, informed consideration of possible deportation can benefit both the State and noncitizen defendants, who may be able to reach agreements that better satisfy the interests of both parties. This decision will not open the floodgates to challenges of convictions obtained through plea bargains. Cf. *Hill* v. *Lockhart,* 474 U. S. 52, 58. Pp. 12–16.

253 S. W. 3d 482, reversed and remanded.

STEVENS, J., delivered the opinion of the Court, in which KENNEDY, GINSBURG, BREYER, and SOTOMAYOR, JJ., joined. ALITO, J., filed an opinion concurring in the judgment, in which ROBERTS, C. J., joined. SCALIA, J., filed a dissenting opinion, in which THOMAS, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 08–651

JOSE PADILLA, PETITIONER *v.* KENTUCKY

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
KENTUCKY

[March 31, 2010]

JUSTICE STEVENS delivered the opinion of the Court.

Petitioner Jose Padilla, a native of Honduras, has been a lawful permanent resident of the United States for more than 40 years. Padilla served this Nation with honor as a member of the U. S. Armed Forces during the Vietnam War. He now faces deportation after pleading guilty to the transportation of a large amount of marijuana in his tractor-trailer in the Commonwealth of Kentucky.[1]

In this postconviction proceeding, Padilla claims that his counsel not only failed to advise him of this consequence prior to his entering the plea, but also told him that he "'did not have to worry about immigration status since he had been in the country so long.'" 253 S. W. 3d 482, 483 (Ky. 2008). Padilla relied on his counsel's erroneous advice when he pleaded guilty to the drug charges that made his deportation virtually mandatory. He alleges that he would have insisted on going to trial if he had not received incorrect advice from his attorney.

Assuming the truth of his allegations, the Supreme

---

[1] Padilla's crime, like virtually every drug offense except for only the most insignificant marijuana offenses, is a deportable offense under 8 U. S. C. §1227(a)(2)(B)(i).

Court of Kentucky denied Padilla postconviction relief without the benefit of an evidentiary hearing.  The court held that the Sixth Amendment's guarantee of effective assistance of counsel does not protect a criminal defendant from erroneous advice about deportation because it is merely a "collateral" consequence of his conviction.  *Id.*, at 485.  In its view, neither counsel's failure to advise petitioner about the possibility of removal, nor counsel's incorrect advice, could provide a basis for relief.

We granted certiorari, 555 U. S. ___ (2009), to decide whether, as a matter of federal law, Padilla's counsel had an obligation to advise him that the offense to which he was pleading guilty would result in his removal from this country.  We agree with Padilla that constitutionally competent counsel would have advised him that his conviction for drug distribution made him subject to automatic deportation.  Whether he is entitled to relief depends on whether he has been prejudiced, a matter that we do not address.

I

The landscape of federal immigration law has changed dramatically over the last 90 years.  While once there was only a narrow class of deportable offenses and judges wielded broad discretionary authority to prevent deportation, immigration reforms over time have expanded the class of deportable offenses and limited the authority of judges to alleviate the harsh consequences of deportation.  The "drastic measure" of deportation or removal, *Fong Haw Tan* v. *Phelan*, 333 U. S. 6, 10 (1948), is now virtually inevitable for a vast number of noncitizens convicted of crimes.

The Nation's first 100 years was "a period of unimpeded immigration."  C. Gordon & H. Rosenfield, Immigration Law and Procedure §1.(2)(a), p. 5 (1959).  An early effort to empower the President to order the deportation of those

immigrants he "judge[d] dangerous to the peace and safety of the United States," Act of June 25, 1798, ch. 58, 1 Stat. 571, was short lived and unpopular. Gordon §1.2, at 5. It was not until 1875 that Congress first passed a statute barring convicts and prostitutes from entering the country, Act of Mar. 3, 1875, ch. 141, 18 Stat. 477. Gordon §1.2b, at 6. In 1891, Congress added to the list of excludable persons those "who have been convicted of a felony or other infamous crime or misdemeanor involving moral turpitude." Act of Mar. 3, 1891, ch. 551, 26 Stat. 1084.[2]

The Immigration and Nationality Act of 1917 (1917 Act) brought "radical changes" to our law. S. Rep. No. 1515, 81st Cong., 2d Sess., pp. 54–55 (1950). For the first time in our history, Congress made classes of noncitizens deportable based on conduct committed on American soil. *Id.*, at 55. Section 19 of the 1917 Act authorized the deportation of "any alien who is hereafter sentenced to imprisonment for a term of one year or more because of conviction in this country of a crime involving moral turpitude, committed within five years after the entry of the alien to the United States . . . ." 39 Stat. 889. And §19 also rendered deportable noncitizen recidivists who commit two or more crimes of moral turpitude at any time after entry. *Ibid.* Congress did not, however, define the term "moral turpitude."

While the 1917 Act was "radical" because it authorized deportation as a consequence of certain convictions, the Act also included a critically important procedural protection to minimize the risk of unjust deportation: At the time of sentencing or within 30 days thereafter, the sentencing judge in both state and federal prosecutions had the power to make a recommendation "that such alien

―――――――
[2] In 1907, Congress expanded the class of excluded persons to include individuals who "admit" to having committed a crime of moral turpitude. Act of Feb. 20, 1907, ch. 1134, 34 Stat. 899.

shall not be deported." *Id.,* at 890.[3] This procedure, known as a judicial recommendation against deportation, or JRAD, had the effect of binding the Executive to prevent deportation; the statute was "consistently . . . interpreted as giving the sentencing judge conclusive authority to decide whether a particular conviction should be disregarded as a basis for deportation," *Janvier* v. *United States*, 793 F. 2d 449, 452 (CA2 1986). Thus, from 1917 forward, there was no such creature as an automatically deportable offense. Even as the class of deportable offenses expanded, judges retained discretion to ameliorate unjust results on a case-by-case basis.

Although narcotics offenses—such as the offense at issue in this case—provided a distinct basis for deportation as early as 1922,[4] the JRAD procedure was generally

———————

[3] As enacted, the statute provided:

"That the provision of this section respecting the deportation of aliens convicted of a crime involving moral turpitude shall not apply to one who has been pardoned, nor shall such deportation be made or directed if the court, or judge thereof, sentencing such alien for such crime shall, at the time of imposing judgment or passing sentence or within thirty days thereafter, . . . make a recommendation to the Secretary of Labor that such alien shall not be deported in pursuance of this Act." 1917 Act, 39 Stat. 889–890.

This provision was codified in 8 U. S. C. §1251(b) (1994 ed.) (transferred to §1227 (2006 ed. )). The judge's nondeportation recommendation was binding on the Secretary of Labor and, later, the Attorney General after control of immigration removal matters was transferred from the former to the latter. See *Janvier* v. *United States*, 793 F. 2d 449, 452 (CA2 1986).

[4] Congress first identified narcotics offenses as a special category of crimes triggering deportation in the 1922 Narcotic Drug Act. Act of May 26, 1922, ch. 202, 42 Stat. 596. After the 1922 Act took effect, there was some initial confusion over whether a narcotics offense also had to be a crime of moral turpitude for an individual to be deportable. See *Weedin* v. *Moy Fat*, 8 F. 2d 488, 489 (CA9 1925) (holding that an individual who committed narcotics offense was not deportable because offense did not involve moral turpitude). However, lower courts eventually agreed that the narcotics offense provision was "special," *Chung*

available to avoid deportation in narcotics convictions. See *United States* v. *O'Rourke*, 213 F. 2d 759, 762 (CA8 1954). Except for "technical, inadvertent and insignificant violations of the laws relating to narcotics," *ibid.*, it appears that courts treated narcotics offenses as crimes involving moral turpitude for purposes of the 1917 Act's broad JRAD provision. See *ibid.* (recognizing that until 1952 a JRAD in a narcotics case "was effective to prevent deportation" (citing *Dang Nam* v. *Bryan*, 74 F. 2d 379, 380–381 (CA9 1934))).

In light of both the steady expansion of deportable offenses and the significant ameliorative effect of a JRAD, it is unsurprising that, in the wake of *Strickland* v. *Washington*, 466 U. S. 668 (1984), the Second Circuit held that the Sixth Amendment right to effective assistance of counsel applies to a JRAD request or lack thereof, see *Janvier,* 793 F. 2d 449. See also *United States* v. *Castro*, 26 F. 3d 557 (CA5 1994). In its view, seeking a JRAD was "part of the sentencing" process, *Janvier*, 793 F. 2d, at 452, even if deportation itself is a civil action. Under the Second Circuit's reasoning, the impact of a conviction on a noncitizen's ability to remain in the country was a central issue to be resolved during the sentencing process—not merely a collateral matter outside the scope of counsel's duty to provide effective representation.

However, the JRAD procedure is no longer part of our law. Congress first circumscribed the JRAD provision in the 1952 Immigration and Nationality Act (INA),[5] and in

———————

*Que Fong* v. *Nagle*, 15 F. 2d 789, 790 (CA9 1926); thus, a narcotics offense did not need also to be a crime of moral turpitude (or to satisfy other requirements of the 1917 Act) to trigger deportation. See *United States ex rel. Grimaldi* v. *Ebey*, 12 F. 2d 922, 923 (CA7 1926); *Todaro* v. *Munster*, 62 F. 2d 963, 964 (CA10 1933).

[5] The Act separately codified the moral turpitude offense provision and the narcotics offense provision within 8 U. S. C. §1251(a) (1994 ed.) under subsections (a)(4) and (a)(11), respectively. See 66 Stat. 201, 204,

1990 Congress entirely eliminated it, 104 Stat. 5050. In 1996, Congress also eliminated the Attorney General's authority to grant discretionary relief from deportation, 110 Stat. 3009–596, an authority that had been exercised to prevent the deportation of over 10,000 noncitizens during the 5-year period prior to 1996, *INS* v. *St. Cyr*, 533 U. S. 289, 296 (2001). Under contemporary law, if a non-citizen has committed a removable offense after the 1996 effective date of these amendments, his removal is practically inevitable but for the possible exercise of limited remnants of equitable discretion vested in the Attorney General to cancel removal for noncitizens convicted of particular classes of offenses.[6] See 8 U. S. C. §1229b. Subject to limited exceptions, this discretionary relief is not available for an offense related to trafficking in a controlled substance. See §1101(a)(43)(B); §1228.

These changes to our immigration law have dramatically raised the stakes of a noncitizen's criminal conviction. The importance of accurate legal advice for noncitizens accused of crimes has never been more important. These changes confirm our view that, as a matter of federal law, deportation is an integral part—indeed, sometimes the most important part[7]—of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes.

––––––––––

206. The JRAD procedure, codified in 8 U. S. C. §1251(b) (1994 ed.), applied only to the "provisions of subsection (a)(4)," the crimes-of-moral-turpitude provision. 66 Stat. 208; see *United States* v. *O'Rourke*, 213 F. 2d 759, 762 (CA8 1954) (recognizing that, under the 1952 Act, narcotics offenses were no longer eligible for JRADs).

[6]The changes to our immigration law have also involved a change in nomenclature; the statutory text now uses the term "removal" rather than "deportation." See *Calcano-Martinez* v. *INS*, 533 U. S. 348, 350, n. 1 (2001).

[7]See Brief for Asian American Justice Center et al. as *Amici Curiae* 12–27 (providing real-world examples).

Opinion of the Court

## II

Before deciding whether to plead guilty, a defendant is entitled to "the effective assistance of competent counsel." *McMann* v. *Richardson*, 397 U. S. 759, 771 (1970); *Strickland*, 466 U. S., at 686. The Supreme Court of Kentucky rejected Padilla's ineffectiveness claim on the ground that the advice he sought about the risk of deportation concerned only collateral matters, *i.e.*, those matters not within the sentencing authority of the state trial court.[8] 253 S. W. 3d, at 483–484 (citing *Commonwealth* v. *Fuartado*, 170 S. W. 3d 384 (2005)). In its view, "collateral consequences are outside the scope of representation required by the Sixth Amendment," and, therefore, the "failure of defense counsel to advise the defendant of possible deportation consequences is not cognizable as a claim for ineffective assistance of counsel." 253 S. W. 3d, at 483. The Kentucky high court is far from alone in this view.[9]

---

[8] There is some disagreement among the courts over how to distinguish between direct and collateral consequences. See Roberts, Ignorance is Effectively Bliss: Collateral Consequences, Silence, and Misinformation in the Guilty-Plea Process, 95 Iowa L. Rev. 119, 124, n. 15 (2009). The disagreement over how to apply the direct/collateral distinction has no bearing on the disposition of this case because, as even JUSTICE ALITO agrees, counsel must, at the very least, advise a noncitizen "defendant that a criminal conviction may have adverse immigration consequences," *post*, at 1 (opinion concurring in judgment). See also *post*, at 14 ("I do not mean to suggest that the Sixth Amendment does no more than require defense counsel to avoid misinformation"). In his concurring opinion, JUSTICE ALITO has thus departed from the strict rule applied by the Supreme Court of Kentucky and in the two federal cases that he cites, *post*, at 2.

[9] See, *e.g.*, *United States* v. *Gonzalez*, 202 F. 3d 20 (CA1 2000); *United States* v. *Del Rosario*, 902 F. 2d 55 (CADC 1990); *United States* v. *Yearwood*, 863 F. 2d 6 (CA4 1988); *Santos-Sanchez* v. *United States*, 548 F. 3d 327 (CA5 2008); *Broomes* v. *Ashcroft*, 358 F. 3d 1251 (CA10 2004); *United States* v. *Campbell*, 778 F. 2d 764 (CA11 1985); *Oyekoya* v. *State*, 558 So. 2d 990 (Ala. Ct. Crim. App. 1989); *State* v. *Rosas*, 183

We, however, have never applied a distinction between direct and collateral consequences to define the scope of constitutionally "reasonable professional assistance" required under *Strickland*, 466 U. S., at 689. Whether that distinction is appropriate is a question we need not consider in this case because of the unique nature of deportation.

We have long recognized that deportation is a particularly severe "penalty," *Fong Yue Ting* v. *United States*, 149 U. S. 698, 740 (1893); but it is not, in a strict sense, a criminal sanction. Although removal proceedings are civil in nature, see *INS* v. *Lopez-Mendoza*, 468 U. S. 1032, 1038 (1984), deportation is nevertheless intimately related to the criminal process. Our law has enmeshed criminal convictions and the penalty of deportation for nearly a century, see Part I, *supra*, at 2–7. And, importantly, recent changes in our immigration law have made removal nearly an automatic result for a broad class of noncitizen offenders. Thus, we find it "most difficult" to divorce the penalty from the conviction in the deportation context. *United States* v. *Russell*, 686 F. 2d 35, 38 (CADC 1982). Moreover, we are quite confident that noncitizen defendants facing a risk of deportation for a particular offense find it even more difficult. See *St. Cyr*, 533 U. S., at 322 ("There can be little doubt that, as a general matter, alien defendants considering whether to enter into a plea agreement are acutely aware of the immigration consequences of their convictions").

Deportation as a consequence of a criminal conviction is, because of its close connection to the criminal process, uniquely difficult to classify as either a direct or a collateral consequence. The collateral versus direct distinction

_____

Ariz. 421, 904 P. 2d 1245 (App. 1995); *State* v. *Montalban*, 2000–2739 (La. 2/26/02), 810 So. 2d 1106; *Commonwealth* v. *Frometa*, 520 Pa. 552, 555 A. 2d 92 (1989).

Opinion of the Court

is thus ill-suited to evaluating a *Strickland* claim concerning the specific risk of deportation. We conclude that advice regarding deportation is not categorically removed from the ambit of the Sixth Amendment right to counsel. *Strickland* applies to Padilla's claim.

### III

Under *Strickland*, we first determine whether counsel's representation "fell below an objective standard of reasonableness." 466 U. S., at 688. Then we ask whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*, at 694. The first prong—constitutional deficiency—is necessarily linked to the practice and expectations of the legal community: "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.*, at 688. We long have recognized that "[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable . . . ." *Ibid.; Bobby* v. *Van Hook*, 558 U. S. ___, ___ (2009) *(per curiam)* (slip op., at 3); *Florida* v. *Nixon*, 543 U. S. 175, 191, and n. 6 (2004); *Wiggins* v. *Smith,* 539 U. S. 510, 524 (2003); *Williams* v. *Taylor*, 529 U. S. 362, 396 (2000). Although they are "only guides," *Strickland*, 466 U. S., at 688, and not "inexorable commands," *Bobby*, 558 U. S., at ___ (slip op., at 5), these standards may be valuable measures of the prevailing professional norms of effective representation, especially as these standards have been adapted to deal with the intersection of modern criminal prosecutions and immigration law.

The weight of prevailing professional norms supports the view that counsel must advise her client regarding the risk of deportation. National Legal Aid and Defender Assn., Performance Guidelines for Criminal Representation §6.2 (1995); G. Herman, Plea Bargaining §3.03,

pp. 20–21 (1997); Chin & Holmes, Effective Assistance of Counsel and the Consequences of Guilty Pleas, 87 Cornell L. Rev. 697, 713–718 (2002); A. Campbell, Law of Sentencing §13:23, pp. 555, 560 (3d ed. 2004); Dept. of Justice, Office of Justice Programs, 2 Compendium of Standards for Indigent Defense Systems, Standards for Attorney Performance, pp. D10, H8–H9, J8 (2000) (providing survey of guidelines across multiple jurisdictions); ABA Standards for Criminal Justice, Prosecution Function and Defense Function 4–5.1(a), p. 197 (3d ed. 1993); ABA Standards for Criminal Justice, Pleas of Guilty 14–3.2(f), p. 116 (3d ed. 1999). "[A]uthorities of every stripe— including the American Bar Association, criminal defense and public defender organizations, authoritative treatises, and state and city bar publications—universally require defense attorneys to advise as to the risk of deportation consequences for non-citizen clients . . . ." Brief for Legal Ethics, Criminal Procedure, and Criminal Law Professors as *Amici Curiae* 12–14 (footnotes omitted) (citing, *inter alia*, National Legal Aid and Defender Assn., Guidelines, *supra,* §§6.2–6.4 (1997); S. Bratton & E. Kelley, Practice Points: Representing a Noncitizen in a Criminal Case, 31 The Champion 61 (Jan./Feb. 2007); N. Tooby, Criminal Defense of Immigrants §1.3 (3d ed. 2003); 2 Criminal Practice Manual §§45:3, 45:15 (2009)).

We too have previously recognized that " '[p]reserving the client's right to remain in the United States may be more important to the client than any potential jail sentence.'" *St. Cyr*, 533 U. S., at 323 (quoting 3 Criminal Defense Techniques §§60A.01, 60A.02[2] (1999)). Likewise, we have recognized that "preserving the possibility of" discretionary relief from deportation under §212(c) of the 1952 INA, 66 Stat. 187, repealed by Congress in 1996, "would have been one of the principal benefits sought by defendants deciding whether to accept a plea offer or instead to proceed to trial." *St. Cyr*, 533 U. S., at 323. We

expected that counsel who were unaware of the discretionary relief measures would "follo[w] the advice of numerous practice guides" to advise themselves of the importance of this particular form of discretionary relief. *Ibid.,* n. 50.

In the instant case, the terms of the relevant immigration statute are succinct, clear, and explicit in defining the removal consequence for Padilla's conviction. See 8 U. S. C. §1227(a)(2)(B)(i) ("Any alien who at any time after admission has been convicted of a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States or a foreign country relating to a controlled substance . . . , other than a single offense involving possession for one's own use of 30 grams or less of marijuana, is deportable"). Padilla's counsel could have easily determined that his plea would make him eligible for deportation simply from reading the text of the statute, which addresses not some broad classification of crimes but specifically commands removal for all controlled substances convictions except for the most trivial of marijuana possession offenses. Instead, Padilla's counsel provided him false assurance that his conviction would not result in his removal from this country. This is not a hard case in which to find deficiency: The consequences of Padilla's plea could easily be determined from reading the removal statute, his deportation was presumptively mandatory, and his counsel's advice was incorrect.

Immigration law can be complex, and it is a legal specialty of its own. Some members of the bar who represent clients facing criminal charges, in either state or federal court or both, may not be well versed in it. There will, therefore, undoubtedly be numerous situations in which the deportation consequences of a particular plea are unclear or uncertain. The duty of the private practitioner in such cases is more limited. When the law is not succinct and straightforward (as it is in many of the scenarios

posited by JUSTICE ALITO), a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences.[10]  But when the deportation consequence is truly clear, as it was in this case, the duty to give correct advice is equally clear.

Accepting his allegations as true, Padilla has sufficiently alleged constitutional deficiency to satisfy the first prong of *Strickland*.  Whether Padilla is entitled to relief on his claim will depend on whether he can satisfy *Strickland*'s second prong, prejudice, a matter we leave to the Kentucky courts to consider in the first instance.

                                IV

The Solicitor General has urged us to conclude that *Strickland* applies to Padilla's claim only to the extent that he has alleged affirmative misadvice.  In the United States' view, "counsel is not constitutionally required to provide advice on matters that will not be decided in the criminal case . . . ," though counsel is required to provide accurate advice if she chooses to discusses these matters. Brief for United States as *Amicus Curiae* 10.

Respondent and Padilla both find the Solicitor General's proposed rule unpersuasive, although it has support among the lower courts.  See, *e.g.*, *United States* v. *Couto*, 311 F. 3d 179, 188 (CA2 2002); *United States* v. *Kwan*, 407 F. 3d 1005 (CA9 2005); *Sparks* v. *Sowders*, 852 F. 2d 882 (CA6 1988); *United States* v. *Russell*, 686 F. 2d 35 (CADC 1982); *State* v. *Rojas-Martinez*, 2005 UT 86, 125 P. 3d 930, 935; *In re Resendiz*, 25 Cal. 4th 230, 19 P. 3d 1171 (2001). Kentucky describes these decisions isolating an affirmative misadvice claim as "result-driven, incestuous . . .

_____

[10] As JUSTICE ALITO explains at length, deportation consequences are often unclear.  Lack of clarity in the law, however, does not obviate the need for counsel to say something about the possibility of deportation, even though it will affect the scope and nature of counsel's advice.

[,and] completely lacking in legal or rational bases." Brief for Respondent 31. We do not share that view, but we agree that there is no relevant difference "between an act of commission and an act of omission" in this context. *Id.*, at 30; *Strickland*, 466 U. S., at 690 ("The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance"); see also *State* v. *Paredez*, 2004–NMSC–036, 136 N. M. 533, 538–539.

A holding limited to affirmative misadvice would invite two absurd results. First, it would give counsel an incentive to remain silent on matters of great importance, even when answers are readily available. Silence under these circumstances would be fundamentally at odds with the critical obligation of counsel to advise the client of "the advantages and disadvantages of a plea agreement." *Libretti* v. *United States*, 516 U. S. 29, 50–51 (1995). When attorneys know that their clients face possible exile from this country and separation from their families, they should not be encouraged to say nothing at all.[11] Second, it would deny a class of clients least able to represent themselves the most rudimentary advice on deportation even when it is readily available. It is quintessentially the duty of counsel to provide her client with available advice about an issue like deportation and the failure to do so "clearly satisfies the first prong of the *Strickland* analysis." *Hill* v. *Lockhart*, 474 U. S. 52, 62 (1985) (White, J.,

—————————

[11] As the Commonwealth conceded at oral argument, were a defendant's lawyer to know that a particular offense would result in the client's deportation and that, upon deportation, the client and his family might well be killed due to circumstances in the client's home country, any decent attorney would inform the client of the consequences of his plea. Tr. of Oral Arg. 37–38. We think the same result should follow when the stakes are not life and death but merely "banishment or exile," *Delgadillo* v. *Carmichael*, 332 U. S. 388, 390–391 (1947).

concurring in judgment).

We have given serious consideration to the concerns that the Solicitor General, respondent, and *amici* have stressed regarding the importance of protecting the finality of convictions obtained through guilty pleas. We confronted a similar "floodgates" concern in *Hill*, see *id.,* at 58, but nevertheless applied *Strickland* to a claim that counsel had failed to advise the client regarding his parole eligibility before he pleaded guilty.[12]

A flood did not follow in that decision's wake. Surmounting *Strickland*'s high bar is never an easy task. See, *e.g.*, 466 U. S., at 689 ("Judicial scrutiny of counsel's performance must be highly deferential"); *id.,* at 693 (observing that "[a]ttorney errors . . . are as likely to be utterly harmless in a particular case as they are to be prejudicial"). Moreover, to obtain relief on this type of claim, a petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances. See *Roe* v. *Flores-Ortega*, 528 U. S. 470, 480, 486 (2000). There is no reason to doubt that lower courts—now quite experienced with applying *Strickland*—can effectively and efficiently use its framework to

---

[12] However, we concluded that, even though *Strickland* applied to petitioner's claim, he had not sufficiently alleged prejudice to satisfy *Strickland*'s second prong. *Hill*, 474 U. S., at 59–60. This disposition further underscores the fact that it is often quite difficult for petitioners who have acknowledged their guilt to satisfy *Strickland*'s prejudice prong.

JUSTICE ALITO believes that the Court misreads *Hill*, *post*, at 10–11. In *Hill*, the Court recognized—for the first time—that *Strickland* applies to advice respecting a guilty plea. 474 U. S., at 58 ("We hold, therefore, that the two-part *Strickland* v. *Washington* test applies to challenges to guilty pleas based on ineffective assistance of counsel"). It is true that *Hill* does not control the question before us. But its import is nevertheless clear. Whether *Strickland* applies to Padilla's claim follows from *Hill*, regardless of the fact that the *Hill* Court did not resolve the particular question respecting misadvice that was before it.

separate specious claims from those with substantial merit.

It seems unlikely that our decision today will have a significant effect on those convictions already obtained as the result of plea bargains. For at least the past 15 years, professional norms have generally imposed an obligation on counsel to provide advice on the deportation consequences of a client's plea. See, *supra*, at 11–13. We should, therefore, presume that counsel satisfied their obligation to render competent advice at the time their clients considered pleading guilty. *Strickland*, 466 U. S., at 689.

Likewise, although we must be especially careful about recognizing new grounds for attacking the validity of guilty pleas, in the 25 years since we first applied *Strickland* to claims of ineffective assistance at the plea stage, practice has shown that pleas are less frequently the subject of collateral challenges than convictions obtained after a trial. Pleas account for nearly 95% of all criminal convictions.[13] But they account for only approximately 30% of the habeas petitions filed.[14] The nature of relief secured by a successful collateral challenge to a guilty plea—an opportunity to withdraw the plea and proceed to trial—imposes its own significant limiting principle: Those who collaterally attack their guilty pleas lose the benefit of the bargain obtained as a result of the plea. Thus, a different calculus informs whether it is wise to challenge a

_____

[13] See Dept. of Justice, Bureau of Justice Statistics, Sourcebook of Criminal Justice Statistics 2003, p. 418 (31st ed. 2005) (Table 5.17) (only approximately 5%, or 8,612 out of 68,533, of federal criminal prosecutions go to trial); *id.*, at 450 (Table 5.46) (only approximately 5% of all state felony criminal prosecutions go to trial).

[14] See V. Flango, National Center for State Courts, Habeas Corpus in State and Federal Courts 36–38 (1994) (demonstrating that 5% of defendants whose conviction was the result of a trial account for approximately 70% of the habeas petitions filed).

guilty plea in a habeas proceeding because, ultimately, the challenge may result in a *less favorable* outcome for the defendant, whereas a collateral challenge to a conviction obtained after a jury trial has no similar downside potential.

Finally, informed consideration of possible deportation can only benefit both the State and noncitizen defendants during the plea-bargaining process. By bringing deportation consequences into this process, the defense and prosecution may well be able to reach agreements that better satisfy the interests of both parties. As in this case, a criminal episode may provide the basis for multiple charges, of which only a subset mandate deportation following conviction. Counsel who possess the most rudimentary understanding of the deportation consequences of a particular criminal offense may be able to plea bargain creatively with the prosecutor in order to craft a conviction and sentence that reduce the likelihood of deportation, as by avoiding a conviction for an offense that automatically triggers the removal consequence. At the same time, the threat of deportation may provide the defendant with a powerful incentive to plead guilty to an offense that does not mandate that penalty in exchange for a dismissal of a charge that does.

In sum, we have long recognized that the negotiation of a plea bargain is a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel. *Hill*, 474 U. S., at 57; see also *Richardson*, 397 U. S., at 770–771. The severity of deportation—"the equivalent of banishment or exile," *Delgadillo* v. *Carmichael*, 332 U. S. 388, 390–391 (1947)—only underscores how critical it is for counsel to inform her noncitizen client that he faces a risk of deportation.[15]

———————

[15] To this end, we find it significant that the plea form currently used in Kentucky courts provides notice of possible immigration conse-

Opinion of the Court

## V

It is our responsibility under the Constitution to ensure that no criminal defendant—whether a citizen or not—is left to the "mercies of incompetent counsel." *Richardson*, 397 U. S., at 771. To satisfy this responsibility, we now hold that counsel must inform her client whether his plea carries a risk of deportation. Our longstanding Sixth Amendment precedents, the seriousness of deportation as a consequence of a criminal plea, and the concomitant impact of deportation on families living lawfully in this country demand no less.

Taking as true the basis for his motion for postconviction relief, we have little difficulty concluding that Padilla has sufficiently alleged that his counsel was constitutionally deficient. Whether Padilla is entitled to relief will depend on whether he can demonstrate prejudice as a result thereof, a question we do not reach because it was not passed on below. See *Verizon Communications Inc.* v. *FCC*, 535 U. S. 467, 530 (2002).

———————

quences. Ky. Admin. Office of Courts, Motion to Enter Guilty Plea, Form AOC–491 (Rev. 2/2003), http://courts.ky.gov/NR/rdonlyres/ 55E1F54E-ED5C-4A30-B1D5-4C43C7ADD63C/0/491.pdf (as visited Mar. 29, 2010, and available in Clerk of Court's case file). Further, many States require trial courts to advise defendants of possible immigration consequences. See, *e.g.*, Alaska Rule Crim. Proc. 11(c)(3)(C) (2009–2010); Cal. Penal Code Ann. §1016.5 (West 2008); Conn. Gen. Stat. §54–1j (2009); D. C. Code §16–713 (2001); Fla. Rule Crim. Proc. 3.172(c)(8) (Supp. 2010); Ga. Code Ann. §17–7–93(c) (1997); Haw. Rev. Stat. Ann. §802E–2 (2007); Iowa Rule Crim. Proc. 2.8(2)*(b)*(3) (Supp. 2009); Md. Rule 4–242 (Lexis 2009); Mass. Gen. Laws, ch. 278, §29D (2009); Minn. Rule Crim. Proc. 15.01 (2009); Mont. Code Ann. §46–12–210 (2009); N. M. Rule Crim. Form 9–406 (2009); N. Y. Crim. Proc. Law Ann. §220.50(7) (West Supp. 2009); N. C. Gen. Stat. Ann. §15A–1022 (Lexis 2007); Ohio Rev. Code Ann. §2943.031 (West 2006); Ore. Rev. Stat. §135.385 (2007); R. I. Gen. Laws §12–12–22 (Lexis Supp. 2008); Tex. Code. Ann. Crim. Proc., Art. 26.13(a)(4) (Vernon Supp. 2009); Vt. Stat. Ann., Tit. 13, §6565(c)(1) (Supp. 2009); Wash. Rev. Code §10.40.200 (2008); Wis. Stat. §971.08 (2005–2006).

The judgment of the Supreme Court of Kentucky is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 08–651

## JOSE PADILLA, PETITIONER *v.* KENTUCKY

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
KENTUCKY

[March 31, 2010]

JUSTICE ALITO, with whom THE CHIEF JUSTICE joins,
concurring in the judgment.

I concur in the judgment because a criminal defense
attorney fails to provide effective assistance within the
meaning of *Strickland* v. *Washington*, 466 U. S. 668
(1984), if the attorney misleads a noncitizen client regard-
ing the removal consequences of a conviction. In my view,
such an attorney must (1) refrain from unreasonably
providing incorrect advice and (2) advise the defendant
that a criminal conviction may have adverse immigration
consequences and that, if the alien wants advice on this
issue, the alien should consult an immigration attorney. I
do not agree with the Court that the attorney must at-
tempt to explain what those consequences may be. As the
Court concedes, "[i]mmigration law can be complex"; "it is
a legal specialty of its own"; and "[s]ome members of the
bar who represent clients facing criminal charges, in
either state or federal court or both, may not be well
versed in it." *Ante*, at 11. The Court nevertheless holds
that a criminal defense attorney must provide advice in
this specialized area in those cases in which the law is
"succinct and straightforward"—but not, perhaps, in other
situations. *Ante*, at 11–12. This vague, halfway test will
lead to much confusion and needless litigation.

I

Under *Strickland*, an attorney provides ineffective assistance if the attorney's representation does not meet reasonable professional standards. 466 U. S., at 688. Until today, the longstanding and unanimous position of the federal courts was that reasonable defense counsel generally need only advise a client about the *direct* consequences of a criminal conviction. See, *e.g.*, *United States* v. *Gonzalez*, 202 F. 3d 20, 28 (CA1 2000) (ineffective-assistance-of-counsel claim fails if "based on an attorney's failure to advise a client of his plea's immigration consequences"); *United States* v. *Banda*, 1 F. 3d 354, 355 (CA5 1993) (holding that "an attorney's failure to advise a client that deportation is a possible consequence of a guilty plea does not constitute ineffective assistance of counsel"); see generally Chin & Holmes, Effective Assistance of Counsel and the Consequences of Guilty Pleas, 87 Cornell L. Rev. 697, 699 (2002) (hereinafter Chin & Holmes) (noting that "virtually all jurisdictions"—including "eleven federal circuits, more than thirty states, and the District of Columbia"—"hold that defense counsel need not discuss with their clients the collateral consequences of a conviction," including deportation). While the line between "direct" and "collateral" consequences is not always clear, see *ante,* at 7, n. 8, the collateral-consequences rule expresses an important truth: Criminal defense attorneys have expertise regarding the conduct of criminal proceedings. They are not expected to possess—and very often do not possess—expertise in other areas of the law, and it is unrealistic to expect them to provide expert advice on matters that lie outside their area of training and experience.

This case happens to involve removal, but criminal convictions can carry a wide variety of consequences other than conviction and sentencing, including civil commitment, civil forfeiture, the loss of the right to vote, disqualification from public benefits, ineligibility to possess fire-

arms, dishonorable discharge from the Armed Forces, and loss of business or professional licenses. Chin & Holmes 705–706. A criminal conviction may also severely damage a defendant's reputation and thus impair the defendant's ability to obtain future employment or business opportunities. All of those consequences are "seriou[s]," see *ante*, at 17, but this Court has never held that a criminal defense attorney's Sixth Amendment duties extend to providing advice about such matters.

The Court tries to justify its dramatic departure from precedent by pointing to the views of various professional organizations. See *ante*, at 9 ("The weight of prevailing professional norms supports the view that counsel must advise her client regarding the risk of deportation"). However, ascertaining the level of professional competence required by the Sixth Amendment is ultimately a task for the courts. *E.g.*, *Roe* v. *Flores-Ortega*, 528 U. S. 470, 477 (2000). Although we may appropriately consult standards promulgated by private bar groups, we cannot delegate to these groups our task of determining what the Constitution commands. See *Strickland*, *supra,* at 688 (explaining that "[p]revailing norms of practice as reflected in American Bar Association standards . . . are guides to determining what is reasonable, but they are only guides"). And we must recognize that such standards may represent only the aspirations of a bar group rather than an empirical assessment of actual practice.

Even if the only relevant consideration were "prevailing professional norms," it is hard to see how those norms can support the duty the Court today imposes on defense counsel. Because many criminal defense attorneys have little understanding of immigration law, see *ante*, at 11, it should follow that a criminal defense attorney who refrains from providing immigration advice does not violate prevailing professional norms. But the Court's opinion would not just require defense counsel to warn the client

of a general *risk* of removal; it would also require counsel in at least some cases, to specify what the removal *consequences* of a conviction would be.  See *ante*, at 11–12.

The Court's new approach is particularly problematic because providing advice on whether a conviction for a particular offense will make an alien removable is often quite complex.  "Most crimes affecting immigration status are not specifically mentioned by the [Immigration and Nationality Act (INA)], but instead fall under a broad category of crimes, such as *crimes involving moral turpitude* or *aggravated felonies*."  M. Garcia & L. Eig, CRS Report for Congress, Immigration Consequences of Criminal Activity (Sept. 20, 2006) (summary) (emphasis in original).  As has been widely acknowledged, determining whether a particular crime is an "aggravated felony" or a "crime involving moral turpitude [(CIMT)]" is not an easy task.  See R. McWhirter, ABA, The Criminal Lawyer's Guide to Immigration Law: Questions and Answers 128 (2d ed. 2006) (hereinafter ABA Guidebook) ("Because of the increased complexity of aggravated felony law, this edition devotes a new [30-page] chapter to the subject"); *id*., §5.2, at 146 (stating that the aggravated felony list at 8 U. S. C. §1101(a)(43) is not clear with respect to several of the listed categories, that "the term 'aggravated felonies' can include misdemeanors," and that the determination of whether a crime is an "aggravated felony" is made "even more difficult" because "several agencies and courts interpret the statute," including Immigration and Customs Enforcement, the Board of Immigration Appeals (BIA), and Federal Circuit and district courts considering immigration-law and criminal-law issues); ABA Guidebook §4.65, at 130 ("Because nothing is ever simple with immigration law, the terms 'conviction,' 'moral turpitude,' and 'single scheme of criminal misconduct' are terms of art"); *id.,* §4.67, at 130 ("[T]he term 'moral turpitude' evades precise definition").

Defense counsel who consults a guidebook on whether a particular crime is an "aggravated felony" will often find that the answer is not "easily ascertained." For example, the ABA Guidebook answers the question "Does simple possession count as an aggravated felony?" as follows: "Yes, *at least in the Ninth Circuit*." §5.35, at 160 (emphasis added). After a dizzying paragraph that attempts to explain the evolution of the Ninth Circuit's view, the ABA Guidebook continues: "Adding to the confusion, however, is that the Ninth Circuit has conflicting opinions depending on the context on whether simple drug possession constitutes an aggravated felony under 8 U. S. C. §1101(a)(43)." *Id.*, §5.35, at 161 (citing cases distinguishing between whether a simple possession offense is an aggravated felony "for immigration purposes" or for "sentencing purposes"). The ABA Guidebook then proceeds to explain that "*attempted* possession," *id.*, §5.36, at 161 (emphasis added), of a controlled substance *is* an aggravated felony, while "[c]onviction under the federal *accessory* after the fact statute is *probably not* an aggravated felony, but a conviction for accessory after the fact to the manufacture of methamphetamine *is* an aggravated felony," *id.*, §537, at 161 (emphasis added). Conspiracy or attempt to commit drug trafficking are aggravated felonies, but "[s]olicitation is not a drug-trafficking offense because a generic solicitation offense is not an offense related to a controlled substance and therefore not an aggravated felony." *Id.*, §5.41, at 162.

Determining whether a particular crime is one involving moral turpitude is no easier. See *id.*, at 134 ("Writing bad checks *may or may not* be a CIMT" (emphasis added)); *ibid.* ("[R]eckless assault coupled with an element of injury, but not serious injury, is *probably* not a CIMT" (emphasis added)); *id.*, at 135 (misdemeanor driving under the influence is generally not a CIMT, but may be a CIMT if the DUI results in injury or if the driver knew that his

license had been suspended or revoked); *id.*, at 136 ("If there is no element of actual injury, the endangerment offense *may* not be a CIMT" (emphasis added)); *ibid.* ("Whether [a child abuse] conviction involves moral turpitude *may* depend on the subsection under which the individual is convicted. Child abuse done with criminal negligence *probably* is not a CIMT" (emphasis added)).

Many other terms of the INA are similarly ambiguous or may be confusing to practitioners not versed in the intricacies of immigration law. To take just a few examples, it may be hard, in some cases, for defense counsel even to determine whether a client is an alien,[1] or whether a particular state disposition will result in a "conviction" for purposes of federal immigration law.[2] The task of offering advice about the immigration consequences of a criminal conviction is further complicated by other problems, including significant variations among Circuit interpretations of federal immigration statutes; the frequency with

―――――――――

[1] Citizens are not deportable, but "[q]uestions of citizenship are not always simple." ABA Guidebook §4.20, at 113 (explaining that U.S. citizenship conferred by blood is "'derivative,'" and that "[d]erivative citizenship depends on a number of confusing factors, including whether the citizen parent was the mother or father, the immigration laws in effect at the time of the parents' and/or defendant's birth, and the parents' marital status").

[2] "A disposition that is not a 'conviction,' under state law may still be a 'conviction' for immigration purposes." *Id.,* §4.32, at 117 (citing *Matter of Salazar*, 23 I. & N. Dec. 223, 231 (BIA 2002) (en banc)). For example, state law may define the term "conviction" not to include a deferred adjudication, but such an adjudication would be deemed a conviction for purposes of federal immigration law. See ABA Guidebook §4.37; accord, D. Kesselbrenner & L. Rosenberg, Immigration Law and Crimes §2:1, p. 2–2 (2008) (hereinafter Immigration Law and Crimes) ("A practitioner or respondent will not even know whether the Department of Homeland Security (DHS) or the Executive Office for Immigration Review (EOIR) will treat a particular state disposition as a conviction for immigration purposes. In fact, the [BIA] treats certain state criminal dispositions as convictions even though the state treats the same disposition as a dismissal").

which immigration law changes; different rules governing the immigration consequences of juvenile, first-offender, and foreign convictions; and the relationship between the "length and type of sentence" and the determination "whether [an alien] is subject to removal, eligible for relief from removal, or qualified to become a naturalized citizen," Immigration Law and Crimes §2:1, at 2–2 to 2–3.

In short, the professional organizations and guidebooks on which the Court so heavily relies are right to say that "nothing is ever simple with immigration law"—including the determination whether immigration law clearly makes a particular offense removable. ABA Guidebook §4.65, at 130; Immigration Law and Crimes §2:1. I therefore cannot agree with the Court's apparent view that the Sixth Amendment requires criminal defense attorneys to provide immigration advice.

The Court tries to downplay the severity of the burden it imposes on defense counsel by suggesting that the scope of counsel's duty to offer advice concerning deportation consequences may turn on how hard it is to determine those consequences. Where "the terms of the relevant immigration statute are succinct, clear, and explicit in defining the removal consequence[s]" of a conviction, the Court says, counsel has an affirmative duty to advise the client that he will be subject to deportation as a result of the plea. *Ante*, at 11. But "[w]hen the law is not succinct and straightforward . . . , a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences." *Ante*, at 11–12. This approach is problematic for at least four reasons.

First, it will not always be easy to tell whether a particular statutory provision is "succinct, clear, and explicit." How can an attorney who lacks general immigration law expertise be sure that a seemingly clear statutory provision actually means what it seems to say when read in

isolation? What if the application of the provision to a particular case is not clear but a cursory examination of case law or administrative decisions would provide a definitive answer? See Immigration Law and Crimes §2:1, at 2–2 ("Unfortunately, a practitioner or respondent cannot tell easily whether a conviction is for a removable offense. . . . [T]he cautious practitioner or apprehensive respondent will not know conclusively the future immigration consequences of a guilty plea").

Second, if defense counsel must provide advice regarding only one of the many collateral consequences of a criminal conviction, many defendants are likely to be misled. To take just one example, a conviction for a particular offense may render an alien excludable but not removable. If an alien charged with such an offense is advised only that pleading guilty to such an offense will not result in removal, the alien may be induced to enter a guilty plea without realizing that a consequence of the plea is that the alien will be unable to reenter the United States if the alien returns to his or her home country for any reason, such as to visit an elderly parent or to attend a funeral. See ABA Guidebook §4.14, at 111 ("Often the alien is both *excludable* and *removable*. At times, however, the lists are different. Thus, the oddity of an alien that is inadmissible but not deportable. This alien should not leave the United States because the government will not let him back in" (emphasis in original)). Incomplete legal advice may be worse than no advice at all because it may mislead and may dissuade the client from seeking advice from a more knowledgeable source.

Third, the Court's rigid constitutional rule could inadvertently head off more promising ways of addressing the underlying problem—such as statutory or administrative reforms requiring trial judges to inform a defendant on the record that a guilty plea may carry adverse immigration consequences. As *amici* point out, "28 states and the

District of Columbia have *already* adopted rules, plea forms, or statutes requiring courts to advise criminal defendants of the possible immigration consequences of their pleas." Brief for State of Louisiana et al. 25; accord, Chin & Holmes 708 ("A growing number of states require advice about deportation by statute or court rule"). A nonconstitutional rule requiring trial judges to inform defendants on the record of the risk of adverse immigration consequences can ensure that a defendant receives needed information without putting a large number of criminal convictions at risk; and because such a warning would be given on the record, courts would not later have to determine whether the defendant was misrepresenting the advice of counsel. Likewise, flexible statutory procedures for withdrawing guilty pleas might give courts appropriate discretion to determine whether the interests of justice would be served by allowing a particular defendant to withdraw a plea entered into on the basis of incomplete information. Cf. *United States* v. *Russell*, 686 F. 2d 35, 39–40 (CADC 1982) (explaining that a district court's discretion to set aside a guilty plea under the Federal Rules of Criminal Procedure should be guided by, among other considerations, "the possible existence of prejudice to the government's case as a result of the defendant's untimely request to stand trial" and "the strength of the defendant's reason for withdrawing the plea, including whether the defendant asserts his innocence of the charge").

Fourth, the Court's decision marks a major upheaval in Sixth Amendment law. This Court decided *Strickland* in 1984, but the majority does not cite a single case, from this or any other federal court, holding that criminal defense counsel's failure to provide advice concerning the removal consequences of a criminal conviction violates a defendant's Sixth Amendment right to counsel. As noted above, the Court's view has been rejected by every Federal Court

of Appeals to have considered the issue thus far. See, *e.g.*, *Gonzalez*, 202 F. 3d, at 28; *Banda*, 1 F. 3d, at 355; Chin & Holmes 697, 699. The majority appropriately acknowledges that the lower courts are "now quite experienced with applying *Strickland*," *ante*, at 14, but it casually dismisses the longstanding and unanimous position of the lower federal courts with respect to the scope of criminal defense counsel's duty to advise on collateral consequences.

The majority seeks to downplay its dramatic expansion of the scope of criminal defense counsel's duties under the Sixth Amendment by claiming that this Court in *Hill* v. *Lockhart*, 474 U. S. 52 (1985), similarly "applied *Strickland* to a claim that counsel had failed to advise the client regarding his parole eligibility before he pleaded guilty." *Ante*, at 14. That characterization of *Hill* obscures much more than it reveals. The issue in *Hill* was whether a criminal defendant's Sixth Amendment right to counsel was violated where counsel misinformed the client about his eligibility for parole. The Court found it "unnecessary to determine whether there may be circumstances under which erroneous advice by counsel as to parole eligibility may be deemed constitutionally ineffective assistance of counsel, because in the present case we conclude that petitioner's allegations are insufficient to satisfy the *Strickland* v. *Washington* requirement of 'prejudice.'" 474 U. S., at 60. Given that *Hill* expressly and unambiguously refused to decide whether criminal defense counsel must *avoid misinforming* his or her client as to *one* consequence of a criminal conviction (parole eligibility), that case plainly provides no support whatsoever for the proposition that counsel must *affirmatively advise* his or her client as to *another* collateral consequence (removal). By the Court's strange logic, *Hill* would support its decision here even if the Court had held that misadvice concerning parole eligibility does *not* make counsel's performance

objectively unreasonable. After all, the Court still would have "applied *Strickland*" to the facts of the case at hand.

## II

While mastery of immigration law is not required by *Strickland*, several considerations support the conclusion that affirmative misadvice regarding the removal consequences of a conviction may constitute ineffective assistance.

First, a rule prohibiting affirmative misadvice regarding a matter as crucial to the defendant's plea decision as deportation appears faithful to the scope and nature of the Sixth Amendment duty this Court has recognized in its past cases. In particular, we have explained that "a guilty plea cannot be attacked as based on inadequate legal advice unless counsel was not 'a reasonably competent attorney' and the advice was not 'within the range of competence demanded of attorneys *in criminal cases*.'" *Strickland*, 466 U. S., at 687 (quoting *McMann* v. *Richardson*, 397 U. S. 759, 770, 771 (1970); emphasis added). As the Court appears to acknowledge, thorough understanding of the intricacies of immigration law is not "within the range of competence demanded of attorneys *in criminal cases*." See *ante*, at 11 ("Immigration law can be complex, and it is a legal specialty of its own. Some members of the bar who represent clients facing criminal charges, in either state or federal court or both, may not be well versed in it"). By contrast, reasonably competent attorneys should know that it is not appropriate or responsible to hold themselves out as authorities on a difficult and complicated subject matter with which they are not familiar. Candor concerning the limits of one's professional expertise, in other words, is within the range of duties reasonably expected of defense attorneys in criminal cases. As the dissenting judge on the Kentucky Supreme Court put it, "I do not believe it is too much of a burden to place

on our defense bar the duty to say, 'I do not know.'" 253 S. W. 3d 482, 485 (2008).

Second, incompetent advice distorts the defendant's decisionmaking process and seems to call the fairness and integrity of the criminal proceeding itself into question. See *Strickland*, 466 U. S., at 686 ("In giving meaning to the requirement [of effective assistance of counsel], we must take its purpose—to ensure a fair trial—as the guide"). When a defendant opts to plead guilty without definitive information concerning the likely effects of the plea, the defendant can fairly be said to assume the risk that the conviction may carry indirect consequences of which he or she is not aware. That is not the case when a defendant bases the decision to plead guilty on counsel's express misrepresentation that the defendant will not be removable. In the latter case, it seems hard to say that the plea was entered with the advice of constitutionally competent counsel—or that it embodies a voluntary and intelligent decision to forsake constitutional rights. See *ibid.* ("The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result").

Third, a rule prohibiting unreasonable misadvice regarding exceptionally important collateral matters would not deter or interfere with ongoing political and administrative efforts to devise fair and reasonable solutions to the difficult problem posed by defendants who plead guilty without knowing of certain important collateral consequences.

Finally, the conclusion that affirmative misadvice regarding the removal consequences of a conviction can give rise to ineffective assistance would, unlike the Court's approach, not require any upheaval in the law. As the Solicitor General points out, "[t]he vast majority of the

lower courts considering claims of ineffective assistance in the plea context have [distinguished] between defense counsel who remain silent and defense counsel who give affirmative misadvice." Brief for United States as *Amicus Curiae* 8 (citing cases). At least three Courts of Appeals have held that affirmative misadvice on immigration matters can give rise to ineffective assistance of counsel, at least in some circumstances.[3] And several other Circuits have held that affirmative misadvice concerning nonimmigration consequences of a conviction can violate the Sixth Amendment even if those consequences might be deemed "collateral."[4] By contrast, it appears that no court of appeals holds that affirmative misadvice concerning collateral consequences in general and removal in particular can *never* give rise to ineffective assistance. In short,

———————

[3] See *United States* v. *Kwan*, 407 F. 3d 1005, 1015–1017 (CA9 2005); *United States* v. *Couto*, 311 F. 3d 179, 188 (CA2 2002); *Downs-Morgan* v. *United States*, 765 F. 2d 1534, 1540–1541 (CA11 1985) (limiting holding to the facts of the case); see also *Santos-Sanchez* v. *United State*s, 548 F. 3d 327, 333–334 (CA5 2008) (concluding that counsel's advice was not objectively unreasonable where counsel did not purport to answer questions about immigration law, did not claim any expertise in immigration law, and simply warned of "possible" deportation consequence; use of the word "possible" was not an affirmative misrepresentation, even though it could indicate that deportation was not a certain consequence).

[4] See *Hill* v. *Lockhart*, 894 F. 2d 1009, 1010 (CA8 1990) (en banc) ("[T]he erroneous parole-eligibility advice given to Mr. Hill was ineffective assistance of counsel under *Strickland v. Washington*"); *Sparks* v. *Sowders*, 852 F. 2d 882, 885 (CA6 1988) ("[G]ross misadvice concerning parole eligibility can amount to ineffective assistance of counsel"); *id.,* at 886 (Kennedy, J., concurring) ("When the maximum possible exposure is overstated, the defendant might well be influenced to accept a plea agreement he would otherwise reject"); *Strader* v. *Garrison*, 611 F. 2d 61, 65 (CA4 1979) ("[T]hough parole eligibility dates are collateral consequences of the entry of a guilty plea of which a defendant need not be informed if he does not inquire, when he is grossly misinformed about it by his lawyer, and relies upon that misinformation, he is deprived of his constitutional right to counsel").

the considered and thus far unanimous view of the lower federal courts charged with administering *Strickland* clearly supports the conclusion that that Kentucky Supreme Court's position goes too far.

In concluding that affirmative misadvice regarding the removal consequences of a criminal conviction may constitute ineffective assistance, I do not mean to suggest that the Sixth Amendment does no more than require defense counsel to avoid misinformation. When a criminal defense attorney is aware that a client is an alien, the attorney should advise the client that a criminal conviction may have adverse consequences under the immigration laws and that the client should consult an immigration specialist if the client wants advice on that subject. By putting the client on notice of the danger of removal, such advice would significantly reduce the chance that the client would plead guilty under a mistaken premise.

## III

In sum, a criminal defense attorney should not be required to provide advice on immigration law, a complex specialty that generally lies outside the scope of a criminal defense attorney's expertise. On the other hand, any competent criminal defense attorney should appreciate the extraordinary importance that the risk of removal might have in the client's determination whether to enter a guilty plea. Accordingly, unreasonable and incorrect information concerning the risk of removal can give rise to an ineffectiveness claim. In addition, silence alone is not enough to satisfy counsel's duty to assist the client. Instead, an alien defendant's Sixth Amendment right to counsel is satisfied if defense counsel advises the client that a conviction may have immigration consequences, that immigration law is a specialized field, that the attorney is not an immigration lawyer, and that the client should consult an immigration specialist if the client wants advice on that subject.

# SUPREME COURT OF THE UNITED STATES

No. 08–651

JOSE PADILLA, PETITIONER *v.* KENTUCKY

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
KENTUCKY

[March 31, 2010]

JUSTICE SCALIA, with whom JUSTICE THOMAS joins,
dissenting.

In the best of all possible worlds, criminal defendants
contemplating a guilty plea ought to be advised of all
serious collateral consequences of conviction, and surely
ought not to be misadvised. The Constitution, however, is
not an all-purpose tool for judicial construction of a perfect
world; and when we ignore its text in order to make it
that, we often find ourselves swinging a sledge where a
tack hammer is needed.

The Sixth Amendment guarantees the accused a lawyer
"for his defense" against a "criminal prosecutio[n]"—not
for sound advice about the collateral consequences of
conviction. For that reason, and for the practical reasons
set forth in Part I of JUSTICE ALITO's concurrence, I dis-
sent from the Court's conclusion that the Sixth Amend-
ment requires counsel to provide accurate advice concern-
ing the potential removal consequences of a guilty plea.
For the same reasons, but unlike the concurrence, I do not
believe that affirmative misadvice about those conse-
quences renders an attorney's assistance in defending
against the prosecution constitutionally inadequate; or
that the Sixth Amendment requires counsel to warn im-
migrant defendants that a conviction may render them
removable. Statutory provisions can remedy these con-
cerns in a more targeted fashion, and without producing

permanent, and legislatively irreparable, overkill.

\*    \*    \*

The Sixth Amendment as originally understood and ratified meant only that a defendant had a right to employ counsel, or to use volunteered services of counsel. See, *United States* v. *Van Duzee*, 140 U. S. 169, 173 (1891); W. Beaney, Right to Counsel in American Courts 21, 28–29 (1955). We have held, however, that the Sixth Amendment requires the provision of counsel to indigent defendants at government expense, *Gideon* v. *Wainwright*, 372 U. S. 335, 344–345 (1963), and that the right to "the assistance of counsel" includes the right to *effective* assistance, *Strickland* v. *Washington*, 466 U. S. 668, 686 (1984). Even assuming the validity of these holdings, I reject the significant further extension that the Court, and to a lesser extent the concurrence, would create. We have until today at least retained the Sixth Amendment's textual limitation to criminal prosecutions. "[W]e have held that 'defence' means defense at trial, not defense in relation to other objectives that may be important to the accused." *Rothgery* v. *Gillespie County,* 554 U. S. \_\_\_, \_\_\_ (2008) (ALITO, J., concurring) (slip op., at 4) (summarizing cases). We have limited the Sixth Amendment to legal advice directly related to defense against prosecution of the charged offense—advice at trial, of course, but also advice at postindictment interrogations and lineups, *Massiah* v. *United States*, 377 U. S. 201, 205–206 (1964); *United States* v. *Wade*, 388 U. S. 218, 236–238 (1967), and in general advice at all phases of the prosecution where the defendant would be at a disadvantage when pitted alone against the legally trained agents of the state, see *Moran* v. *Burbine*, 475 U. S. 412, 430 (1986). Not only have we not required advice of counsel regarding consequences collateral to prosecution, we have not even required counsel appointed to defend against one prosecution to be

present when the defendant is interrogated in connection with another possible prosecution arising from the same event. *Texas* v. *Cobb*, 532 U. S. 162, 164 (2001).

There is no basis in text or in principle to extend the constitutionally required advice regarding guilty pleas beyond those matters germane to the criminal prosecution at hand—to wit, the sentence that the plea will produce, the higher sentence that conviction after trial might entail, and the chances of such a conviction. Such matters fall within "the range of competence demanded of attorneys in criminal cases," *McMann* v. *Richardson*, 397 U. S. 759, 771 (1970). See *id.,* at 769–770 (describing the matters counsel and client must consider in connection with a contemplated guilty plea). We have never held, as the logic of the Court's opinion assumes, that once counsel is appointed all professional responsibilities of counsel—even those extending beyond defense against the prosecution—become constitutional commands. Cf. *Cobb, supra,* at 171, n. 2; *Moran, supra,* at 430. Because the subject of the misadvice here was not the prosecution for which Jose Padilla was entitled to effective assistance of counsel, the Sixth Amendment has no application.

Adding to counsel's duties an obligation to advise about a conviction's collateral consequences has no logical stopping-point. As the concurrence observes,

> "[A] criminal convictio[n] can carry a wide variety of consequences other than conviction and sentencing, including civil commitment, civil forfeiture, the loss of the right to vote, disqualification from public benefits, ineligibility to possess firearms, dishonorable discharge from the Armed Forces, and loss of business or professional licenses. . . . All of those consequences are 'serious,' . . . ." *Ante,* at 2–3 (ALITO, J., concurring in judgment).

But it seems to me that the concurrence suffers from the

same defect.  The same indeterminacy, the same inability to know what areas of advice are relevant, attaches to misadvice.  And the concurrence's suggestion that counsel must warn defendants of potential removal consequences, see *ante*, at 14–15—what would come to be known as the "*Padilla* warning"—cannot be limited to those consequences except by judicial caprice.  It is difficult to believe that the warning requirement would not be extended, for example, to the risk of heightened sentences in later federal prosecutions pursuant to the Armed Career Criminal Act, 18 U. S. C. §924(e).  We could expect years of elaboration upon these new issues in the lower courts, prompted by the defense bar's devising of ever-expanding categories of plea-invalidating misadvice and failures to warn—not to mention innumerable evidentiary hearings to determine whether misadvice really occurred or whether the warning was really given.

The concurrence's treatment of misadvice seems driven by concern about the voluntariness of Padilla's guilty plea.  See *ante*, at 12.  But that concern properly relates to the Due Process Clauses of the Fifth and Fourteenth Amendments, not to the Sixth Amendment.  See *McCarthy* v. *United States*, 394 U. S. 459, 466 (1969); *Brady* v. *United States*, 397 U. S. 742, 748 (1970).  Padilla has not argued before us that his guilty plea was not knowing and voluntary.  If that is, however, the true substance of his claim (and if he has properly preserved it) the state court can address it on remand.[1]  But we should not smuggle the

———————

[1] I do not mean to suggest that the Due Process Clause would surely provide relief.  We have indicated that awareness of "direct consequences" suffices for the validity of a guilty plea.  See *Brady*, 397 U. S., at 755 (internal quotation marks omitted).  And the required colloquy between a federal district court and a defendant required by Federal Rule of Criminal Procedure 11(b) (formerly Rule 11(c)), which we have said approximates the due process requirements for a valid plea, see *Libretti* v. *United States*, 516 U. S. 29, 49–50 (1995), does not mention

claim into the Sixth Amendment.

The Court's holding prevents legislation that could solve the problems addressed by today's opinions in a more precise and targeted fashion. If the subject had not been constitutionalized, legislation could specify which categories of misadvice about matters ancillary to the prosecution invalidate plea agreements, what collateral consequences counsel must bring to a defendant's attention, and what warnings must be given.[2] Moreover, legislation could provide consequences for the misadvice, nonadvice, or failure to warn, other than nullification of a criminal conviction after the witnesses and evidence needed for retrial have disappeared. Federal immigration law might provide, for example, that the near-automatic removal which follows from certain criminal convictions will not apply where the conviction rested upon a guilty plea induced by counsel's misadvice regarding removal consequences. Or legislation might put the government to a choice in such circumstances: Either retry the defendant or forgo the removal. But all that has been precluded in favor of today's sledge hammer.

In sum, the Sixth Amendment guarantees adequate assistance of counsel in defending against a pending criminal prosecution. We should limit both the constitutional obligation to provide advice and the consequences of bad advice to that well defined area.

————————

collateral consequences. Whatever the outcome, however, the effect of misadvice regarding such consequences upon the validity of a guilty plea should be analyzed under the Due Process Clause.

[2] As the Court's opinion notes, *ante,* at 16–17, n. 15, many States—including Kentucky—already require that criminal defendants be warned of potential removal consequences.